

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GARY PIERCE and HEIDI PIERCE,      )
                                   )
                                   )
              Plaintiff,           )
                                   )
       vs.                         )       Case No. 03 C 7524
                                   )
CHICAGO RAIL LINK, L.L.C., CSX     )
TRANSPORTATION, INC., CSX          )
INTERMODAL, INC., and CSX          )
INTERMODAL TERMINALS, INC.,        )
                                   )
              Defendants.          )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Gary Pierce has sued his former employer, Chicago Rail Link, L.L.C. ("CRL"), under the

Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.*, to recover for injuries he sustained

while performing railroad switching duties at the Bedford Park yard. He contends that CRL

negligently failed to provide him with a safe place to work. Pierce has additionally sued CSX

Transportation, Inc. ("CSXT"), the owner of the Bedford Park yard, CSX Intermodal, Inc.

("CSXI"), the lessee of the yard and operator of the intermodal terminal, and CSX Intermodal

Terminals, Inc. ("CSXIT"), the company managing the intermodal services at the yard. He

brings a common law negligence claim against these defendants. Pierce's wife, Heidi Pierce, has

also sued CSXT, CSXI, and CSXIT for loss of consortium. This case is before the Court on

CRL's motion for summary judgment and the CSX defendants' combined motion for summary

1

judgment. For the reasons stated below, the Court denies CRL, CSXT, and CSXI's motions for summary judgment but grants CSXIT's motion.

Pierce was hired by CRL in November 2002, was laid off in January 2003, and was recalled in late July 2003. *Id.* at ¶ 27. CRL provides rail service on its own rail lines and also enters into agreements to provide switching services with several companies that operate intermodal terminals or yards.[1] CRL entered into an agreement with CSXI to provide crews consisting of an engineer and conductor to perform switching services at Bedford Park yard. CSXI is in the business of performing and arranging for intermodal transportation services on behalf of its customers. It is a wholly owned subsidiary of CSX Corporation. CSXIT, a wholly owned subsidiary of CSXI, operates the intermodal transportation services at Bedford Park yard pursuant to a contract with CSXI. CSXT, a common carrier by rail and owner of Bedford Park yard, leases the yard to CSXI. CSXT is also a wholly owned subsidiary of CSX Corporation.

On October 23, 2003, Pierce was injured while performing railroad switching operations at a railroad yard located in Bedford Park, Illinois. Pierce, who was employed by CRL as a conductor, was assigned to work that day with Donald Johnson, a CRL engineer. At the time of the accident, Pierce and Johnson were taking three locomotives provided by CSXI and CSXT from Track Number 8, located on the east end of the yard, to Track Number 13.

The two men pulled the three locomotives to the east on Track Number 8 and out onto the lead track and then proceeded west toward Track Number 13. Johnson operated the controls in the cab of Conrail Number 7310, the easternmost of the three locomotives, while Pierce was

---

[1] An intermodal terminal or yard is a facility where containers and trailers are loaded onto or unloaded from rail cars on railroad tracks and where trains hauling such cars arrive and depart. CRL's 56.1 Stmt. at ¶ 6.

2

riding on the lead end (i.e., westernmost end) of the lead unit, CSXT Number 7724. Pierce was giving directions to Johnson via a standard handheld radio provided by CRL. When the locomotives reached the Number 10/11 switch, Pierce radioed to Johnson to stop east of the switch. Pierce then dismounted the locomotive to "line" the Number 10/11 switch and allow the locomotive to continue west on the lead track. Pierce then radioed that he was going to walk to the west and line the Number 12 switch. As Pierce walked toward the Number 12 switch, he radioed to Johnson to "ease them back" (i.e., to move the locomotives slowly to the west). Johnson proceeded to move the train west. The speed at which the train was traveling is in dispute. Pierce's experts testify that the train was moving as fast as 9 or 10 miles per hour by the time Pierce attempted to remount.

The parties also dispute the chain of events that occurred after Pierce lined the Number 12 switch. What appears to be undisputed is that Pierce lined the Number 12 switch, walked to the Number 13 switch and lined that switch, and at some point attempted to board the moving locomotive. Pl's 56.1 Resp. to CRL's 56.1 Stmt. at ¶ 45. Two Rail Works, Inc. employees saw Pierce operate the Number 12 and 13 switches. *Id.* at ¶¶ 44-45. According to defendants, one of these workers also saw Pierce climb onto the bottom step of the CSXT Number 7724. CRL's 56.1 Stmt. at ¶ 46. Defendants rely on the deposition testimony of Leonard Mitchell, CRL's assistant vice president of operations, and Salvador Ortega, a CRL Roadmaster who inspected the track shortly after the accident. But Mitchell and Ortega were merely relaying what these Rail Works employees had told them during the investigation, Mitchell Dep. at 19; Ortega Dep. at 38-39. Thus, Mitchell and Ortega's testimony is inadmissible hearsay and cannot be considered in deciding the motion for summary judgment. Johnson similarly maintains that Pierce radioed to

3

him that the switches were all lined up, that he was on CSXT Number 7724, and that Johnson should proceed ahead 50 car lengths. Johnson Dep. at 44, 46. Pierce's experts, however, dispute that Johnson would have had time to make this radio communication.

At some point, Pierce ended up on the ground, was struck by one of the locomotives, and ended up at a final resting place approximately fifty feet west of the Number 12/13 switch. Johnson testified that Pierce's clothing was snagged and torn and that it appeared he had been dragged. Pl's Add. Stmt. of Facts at ¶ 51. As a result of the accident, Pierce suffered more than twenty-two fractures, including fractures of the spine and pelvis. *Id.* at ¶ 38. Pierce has no recollection of the accident, and there are no eyewitnesses. *Id.* at 48-49.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine issue of material fact exists, the Court must construe the facts and draw reasonable inferences in favor of Pierce, the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## 1.    Chicago Rail Link's Motion for Summary Judgment

CRL contends that Pierce has offered no evidence that it was negligent or that its negligence caused the accident. Before the Court addresses the merits of CRL's motion, it must first consider three preliminary matters that CRL raises in its reply memorandum involving the admissibility of evidence submitted by Pierce.

### a.    "New Claims" in Pierce's Response

4

First, CRL contends that Pierce should be barred from contending that Johnson was negligent in his operation of the locomotive. Pierce claims in his response that Johnson was negligent in violating Federal Railroad Administration ("FRA") radio standards and procedures when he initiated a shove movement based on an incomplete instruction. Pl's Resp. at 10. Pierce also argues that Johnson was negligent by accelerating to 10 miles per hour knowing that Pierce was attempting to mount the moving locomotives. *Id.* at 12. CRL asserts that neither of these claims, nor any other claims involving Johnson, were made in Pierce's amended complaint or set forth in his response to contention interrogatories, and thus he should be precluded from raising them at this juncture.

In defendants' interrogatories to Pierce, they asked, "Identify by name and/or job title and employer each individual whose conduct you claim caused or contributed to cause the injuries you sustained and identify the manner in which that individual's conduct (or lack of action) caused or contributed to cause the injuries you sustained." Defs' Interr. ¶ 25. Pierce answered, "Investigation continues; Plaintiff adopts his experts' reports on this matter." Pl's Answers to Interr. ¶ 25. In a letter to defense counsel dated May 25, 2004, Pierce supplemented several of his interrogatory responses but failed to supplement number 25 or to tie Johnson to the negligence claim. Because Pierce failed to contend that Johnson's negligence was a contributing cause to the accident prior to the close of fact discovery, CRL maintains that he should not now be allowed to assert these claims. *See Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997) (summary judgment stage "is too late in the day to be adding new claims").

Courts consistently refuse to consider new claims that a party presents for the first time in response to a summary judgment motion. *See id.* (barring plaintiff from adding a promissory

estoppel claim); *Children's Memorial Hosp. v. Correctional Medical Servs., Inc.*, No. 02 C 8228, 2003 WL 120821, at *3 (N.D. Ill. Jan. 10, 2003) (barring plaintiff from adding a *quantum meruit* claim). In the present case, however, Pierce does not seek to add a new claim; the only claim he has alleged against CRL continues to be a negligence claim under the FELA. Rather, his allegations concerning Johnson give rise to a theory of how CRL was negligent.

CRL may nevertheless object to Pierce's use of this evidence on the basis that he failed to disclose the allegations regarding Johnson in response to discovery requests. Rule 37 provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence . . . on a motion any witness or information not so disclosed." Fed. R. Civ. P. 37(c).

Pierce's failure to disclose his allegations concerning Johnson was harmless. CRL filed its motion for summary judgment on October 21, 2004. This was after the fact discovery deadline of October 1, 2004, but before plaintiff's Rule 26(a)(2) expert disclosures were due on November 1, 2004. In spite of Pierce's clear statement that his expert reports would contain specific allegations of negligence that he had not yet disclosed, CRL chose to move for summary judgment before getting these disclosures. CRL has made no attempt to argue that it was prejudiced by these "late" disclosures. And any expense it may have incurred in filing its motion without being aware of the specifics of Pierce's allegations was a product of its own making; if CRL had waited just eleven days until the expert disclosures were due, it would have known the full scope of Pierce's claim. The Court had not set a dispositive motion deadline, so there was no pressure on CRL to move for summary judgment when it did.

6

### b.    Admissibility of Pierce's Experts

CRL next contends that the testimony of four of Pierce's expert witnesses cannot be used to oppose the summary judgment motion because each fails to satisfy the standards for admitting scientific testimony established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[2] As mentioned above, CRL makes this argument in its reply, thus the Court allowed Pierce to file a surreply to CRL's contentions.

The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles set forth *Daubert*. The district court's role is to function as a "gatekeeper," admitting expert testimony only when it meets the two-part analysis the Seventh Circuit has endorsed for evaluating such testimony. First, we must determine whether the expert's testimony is reliable. *Cummins v. Lyle Industries*, 93 F.3d 362, 367 (7th Cir. 1996). This requires the Court to assess whether the expert is qualified in the relevant field and to examine the expert's methodology. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Specifically, the Court must "ensure that the proffered testimony pertains to scientific knowledge," rather than merely consisting of subjective beliefs or unsupported speculations. *Cummins,* 93 F.3d at 367. Several nonexhaustive factors inform the inquiry, including: (1) whether the proffered opinion has been subjected to the scientific method; (2) whether it has been subjected to peer review; (3) whether it has been evaluated in light of the potential rate of error of the technique; and (4) whether it is

---

[2] CRL preliminarily argues that the Court should disregard the testimony of the experts because the affidavits of each states that the "opinions are accurate, true and correct to the best of my information and belief." It cites *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989), in support of its position that Pierce's experts do not possess the requisite personal knowledge. In *Schertz,* however, the expert "failed to demonstrate personal knowledge of the matters attested to and consisted largely of speculation." *Id.* This is not true of Pierce's experts. Each reviewed and analyzed a comprehensive list of materials and evidence in forming their opinions, and certain of the experts performed actual accident site investigation.

7

consistent with the generally accepted method for gathering the relevant scientific evidence. *Id.* at 368. Second, the Court must determine if the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue in the case. *Id.*; *Smith*, 215 F.3d at 721.

The *Daubert* analysis applies to all types of expert testimony, whether it involves traditional scientific theory, or, as in this case, is founded on engineering principles and specialized expertise. *See Smith*, 215 F.3d at 719. Yet the test is a flexible one, and the Court need only use the criteria relevant to the particular kind of expertise being offered. *See id.* Thus, in some situations involving the application of science to a practical problem, some of the above factors may deserve less emphasis. *See Cummins*, 93 F.3d at 368 n.2. The basic thrust of the Court's gatekeeping function is to assure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

When evaluating the reliability of accident reconstruction experts, courts have considered such factors as whether the expert applied well-established engineering techniques to the particular materials at issue, whether the accident reconstruction methodology is based on the expert's practical experience in the area, whether novel methodology has been subject to publication, and the general acceptance of the techniques in the relevant engineering and accident analysis fields. *See Smith*, 215 F.3d at 720-21. Courts have further allowed accident reconstruction experts to testify to facts from which they "claim[] to be able to give an accurate picture of the sequence of events immediately preceding an accident," such as road surface textures, operating characteristics of vehicles, and physical principles of mechanics, such as

8

intertia and velocity. *Brandt v. French*, 638 F.2d 209, 211 (10th Cir. 1981).

CRL contends that four of Pierce's experts do not meet the reliability prong of the *Daubert* analysis. Each of these experts attempts to reconstruct the accident based on the available information and to determine what factors contributed to the accident. The Court acknowledges that this type of analysis requires inferences and educated assumptions in this case, particularly because there were no eyewitnesses and Pierce does not recall the details of the accident. Moreover, this type of accident reconstruction may not lend itself to testing and substantiation to the same extent as other types of expert testimony. The Court's role, however, is to ensure that these experts have adhered to the standards of rigor demanded in their field.

### 1.      William Bogett

Plaintiff's expert William Bogett has a Ph.D in Engineering Management and is the president of a consulting firm that specializes in investigation and accident reconstruction in matters involving personal injury. His expertise is in the evaluation of train operations from an engineering standpoint. He has attended conferences concerning train safety and has authored a publication on train accident reconstruction. Prior to his consulting career, he served as the supervisor of product litigation and safety in General Motors Corporation's Engineering Department. During that time he served as the division's liaison with the Federal Railroad Administration and the National Transportation Safety Board.

Bogett opines that Pierce was injured due to the negligence of the defendants and their employees. In his report, Bogett considers four competing hypotheses of how the accident might have occurred. Though Bogett does not claim that these are the only possible scenarios, he does not explain how he arrived at the four hypotheses or why he did not consider other possibilities.

9

Bogett ultimately reaches a conclusion concerning when and where Pierce attempted to mount the train. But his report fails to supply his methodology for reaching that conclusion, nor does he describe how much time it would normally take a person in Pierce's position to mount and begin to climb the steps.

Though an expert is certainly allowed to posit alternative hypothetical explanations to explain his or her conclusion, these hypothetical alternatives must themselves have "'analytically sound bases' so that they are more than mere 'speculation' by the expert." *Smith*, 215 F.3d at 718-19 (quoting *DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998)). Bogett does not explain what methodology he employed in reaching his conclusions as to the timing of Pierce's movements. If there is a methodology, as opposed to an "ad hoc set of unexamined assumptions," then Bogett failed to explain it or show that his analysis is testable or generally accepted in his field. *Robb v. Burlington Northern and Santa Fe R.R. Co.*, 100 F. Supp. 2d 867, 874 (N.D. Ill. 2000).

Bogett likewise failed to explain the assumptions he made and why these assumptions were appropriate. "An expert must offer good reason to think his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result." *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). Because Bogett has not provided the Court with information sufficient to determine that his analysis meets the requirements of Rule 702 or that his conclusions are based on the application of reliable principles and methods, as opposed to mere guesswork, the Court excludes his opinion from the evidence.

10

### 2. Colon Fulk

CRL next objects to the report of Colon Fulk. However, CRL does not elaborate on its objection beyond stating that Fulk offers opinions on causation without providing any technical or other expert analysis to support them. Though CRL does not challenge Fulk's qualifications, Fulk's extensive experience in the railroad industry is worth noting, as he states that his opinions are a product of his past training and experience in that industry.

Fulk has thirty-two years of experience observing and monitoring the proper application of safety rules, operating rules, and federal regulations. In addition to being a locomotive engineer for Amtrak, he is the president of Railex, Inc, a consulting firm providing services in all aspects of train operations, including investigating accidents and personal injuries. He previously worked as a transportation officer for Norfolk Southern Railway, where his daily responsibilities included teaching and training train and engine service employees.

In reaching his conclusions, Fulk reviewed and analyzed voluminous materials, including interviews, depositions, site inspection reports, event recorder data, photographs, personnel files, accident and inspection reports, CRL's operating rules, and various railroad safety rules, operating rules, and federal regulations. Fulk Rep. at 1-2. Fulk concludes that the accident was caused by unauthorized and improper handling of the train during mounting, and that other contributing factors included CLR's inadequate training of employees, unsafe operating procedures, and its failure to provide proper radio equipment for employees to perform duties safely. *Id.* at 10. Much of Fulk's report addresses CRL's purported negligence in allowing its employees to continue mounting and dismounting moving trains despite the fact that the rail

industry has for years recognized the practice to be a safety hazard.[3] Fulk discusses how CRL's practice deviates from the 1999 SOFA report, supported by the FRA's Office of Research and Development and Office of Safety, which recommends that a locomotive be stopped before a crew member mounts the equipment. *Id.* at 4. He notes that CRL changed its rule from 10 mph to 4 mph while Pierce was on furloughed status and contends that CRL was negligent in failing to test Pierce on this significant rule change. *Id.* at 4.

Fulk also addresses how Johnson's purported negligence in handling the locomotives contributed to the accident. According to Fulk, Johnson violated the General Code of Operating Rules and the Code of Federal Regulations when he moved the locomotive after receiving incomplete instructions from Pierce (Pierce's "shove easy" radio instruction did not include the required mention of a direction and distance prescribed by the rules). *Id.* at 6. Fulk also criticizes Johnson for going faster than the 4 mph speed set by CRL when he knew Pierce was preparing to mount. According to Fulk's calculations, the train speed at the pick-up location was in the 10 mph range. He arrived at this speed by analyzing the event recorder data between the 11 switch and the 13 switch, and taking into consideration that Pierce's radio was found 8-10 feet west of the 13 switch and the locomotive was stopped further west of the 11 switch, meaning that the train might have had even more time to gather speed. Fulk likewise criticizes CRL for failing to address Johnson's reputed tendency to speed, particularly because it is an offense requiring an engineer's certificate to be revoked under the Code of Federal Regulations. *Id.* at 7.

---

[3] CRL's Omnitrax Safety and Work Practices Rules were amended in May 2003 to state that workers getting on moving equipment should "[a]ssure yourself speed is not greater than 4 MPH (a safe walking speed)." Its previous rule had allowed workers to board moving equipment at a speed of 10 MPH. CRL's General Order No. 3, Ex. F.

Finally, Fulk testifies that CRL's training of Pierce was limited and insufficient, noting that Pierce received only a week of classroom training and was then placed in the field for on-the-job training. He compared this relatively scant training to training programs of major railroads that consist of up to six months of training. *Id.* at 8-9. Fulk also claims that the "CSX entity" was negligent by not ensuring that CRL employees complied with "CSX's" rules. *Id.* at 9-10.

The Court concludes that Fulk's opinions are admissible. His report reflects that he arrived at his opinions by applying his extensive experience and expertise in the railroad industry to the specific facts of this case. Fulk is competent to testify in areas of railroad regulation and safety practices, and his opinions on these matters are supported by good grounds based on the facts that are known. Fulk's speed calculation is based on sound engineering principles and is sufficiently explained to meet the requirements of Rule 702.

### 3. Alan Blackwell

Next, CRL attacks the reliability of Alan Blackwell. Blackwell is currently a railway engineering consultant. He also has years of experience as a track inspector and manager of track maintenance. CRL complains that Blackwell failed to provide any explanation or analysis to support his assertion that the condition of a negligently maintained track contributed to the accident. In FELA actions, the employer's violation of a regulation constitutes breach of its duty and negligence per se, and will result in liability if the violation contributed in fact to the injury. *Walden v. Illinois Central Gulf R.R.*, 975 F.2d 361, 364 (7th Cir. 1992). CRL argues, however, that Blackwell has not shown a causal link between the track conditions and the accident.

After conducting an on-site inspection on October 28, 2003 and reviewing the extensive

13

materials provided to him, Blackwell concluded that CRL and the other defendants failed to provide Pierce with a safe place to work. In his report, Blackwell describes how railroads are required to maintain track surface conditions and how the track on which Pierce's accident occurred violated federal regulations. Specifically, Blackwell opines that the track's drainage system was inadequate for the expected waterflow, the ballast section was fouled with foreign material and vegetation, and the ballast was loose, unstable, and not level with the plane of the top of the tie. According to Blackwell, these defects show that defendants failed to follow the American Railway Engineering and Maintenance of Way Association Manual and other railroad standards that are the custom and practice of the industry.

Blackwell addresses causation by explaining how track conditions and the speed of locomotives can cause lateral sway, Blackwell Rep. at 4, which in his experience can affect one's ability to board a locomotive because the rocking and swaying motion changes the level of the step and grip of the handrails. *Id.* at 5. He submits that "based on the speed and track surface conditions, it would be reasonable to conclude that lateral sway of the locomotive affected the ability of Mr. Pierce to properly board the locomotive." *Id.* at 5-6.

Whether the track conditions contributed to the accident is a question for the trier of fact, but the Court finds that Blackwell used the necessary level of intellectual rigor in formulating his conclusions that would be expected of a prudent expert in his field.

### 4.    David Thompson

CRL contends that David Thompson is unqualified to testify regarding train operations and that his opinions are inconsistent with the facts of the case. It maintains that Thompson's long career in academia and dealing with ergonomic issues does not evidence any training or

14

expertise in railroad operations, and thus his conclusions do not contain the requisite level of reliability. The Court disagrees. Thompson, who has a Ph.D in Industrial Engineering and Medicine, has forty-eight years of industrial experience evaluating work performance and work injuries. He is an Emeritus Professor of Industrial Engineering and Engineering Management at Stanford University, where he has taught courses and consulted in Ergonomics, Biomechanics, and Human Factors Engineering. He specializes in analysis of human activity error versus system design defects; slip, trip, misstep, and fall analysis; and reconstruction of personal injury events, among other areas.

Thompson was asked to evaluate the procedures and biomechanics for the safe boarding of a locomotive. His two primary conclusions are that Johnson failed to properly control the speed of the train and that Pierce could not have determined the speed of the train as it neared him. Thompson provides a detailed analysis of why Pierce would be unable to board a moving train traveling at a speed of 10 mph. He also relied on a simulation illustrating Pierce's fall using computer graphics.

Given Thompson's extensive experience with this type of biomechanics analysis, the Court sees no reason why he would be unable to adequately apply his training to the biomechanics of boarding a train. *See Robb*, 100 F. Supp. 2d at 872 ("Someone need not be a specialized railroad accident investigator to have reliable expert opinion about a railroad accident, of course."). Moreover, Thompson did serve as an independent member on the San Francisco Municipal Railway Accident Review Board from 1985 to 1992, thus he has certainly been exposed to railroad accident data. Thompson has ample expertise to conclude that Pierce's attempted mount would have been virtually impossible to accomplish successfully at the speed

15

the train was going.

CRL does not take issue with the soundness of Thompson's methodology but instead contends that his opinions are inconsistent with the facts of this case. CRL argues that Thompson's opinion that Johnson made no effort to control the speed of the locomotive is inconsistent with Johnson's testimony and the event recorder, and that Thompson's opinion that Pierce would not have been able to determine the speed of the train is inconsistent with Pierce's testimony that he had on prior occasions been able to determine when a train was going too fast to board. But "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith*, 215 F.3d at 718. Furthermore, Pierce's testimony regarding his subjective belief that he could determine the speed of approaching trains does not preclude reliance on expert testimony evaluating whether it was objectively possible for him to make such a determination. Thompson's report is therefore properly considered in evaluating defendants' summary judgment motions.

CSXT, CSXI, and CSXIT incorporate CRL's *Daubert* objections into their own motion for summary judgment. These defendants also contend that the experts' opinions do not meet the second aspect of the *Daubert* test, which concerns the testimony's relevance. For an expert's testimony to qualify as relevant under Rule 702, it need not bear directly on the ultimate issue of whether negligence caused plaintiff's accident, but instead must simply assist the jury in determining a fact at issue in the case. *See Smith*, 215 F.3d at 721. Because the testimony of each of the experts concerns the manner in which the accident might have occurred and possible causes of the accident, the testimony unquestionably relates to facts at issue in this case.

16

### c. Contradictions Between Experts and Pierce's Testimony

CRL contends that Bogett and Fulk's opinions that it is unsafe for a conductor to get on and off of moving trains and that CRL provided Pierce with inadequate training cannot be used to create a genuine issue of fact because they contradict Pierce's testimony that based on his experience, he could safely get on and off a moving locomotive, Pierce Dep. at 140-141, and that he believed he had received sufficient training to allow him to perform his job safely. *Id.* at 103.

CRL relies on the rule that a party "cannot thwart the purpose of rule 56 by creating issues of fact through affidavits that contradict their own depositions." *Miller v. A.H. Robins Co.*, 766 F.2d 1102, 1104 (7th Cir. 1985). This rule, however, typically concerns situations in which a party offers his own affidavit to contradict his deposition testimony. Even if the rule were to apply outside that context, the Court would conclude that it does not bar Fulk's opinion. The fact that Pierce, as a lay person, believed he could safely board a moving train and that his training was adequate does not definitively establish the truth of these propositions.

### d. Merits

FELA provides a federal tort remedy for railroad workers injured on the job where such injury or death resulted in whole or in part from the negligence of the common carrier or its employees. 45 U.S.C. § 51. To prevail, the worker must prove the common law elements of negligence, including duty, breach, foreseeability, and causation. *Williams v. Nat'l R.R. Passenger Corp.*, 161 F.3d 1059, 1062 (7th Cir. 1998). A plaintiff's burden of proving causation under FELA, however, is significantly relaxed compared to the burden in an ordinary negligence action. *Id.* at 161. The Supreme Court has held that the issue in a FELA case is simply whether "employer negligence played any part, even the slightest, in producing the injury." *Consolidated*

17

*Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994) (quoting *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506 (1957)). Thus, although Pierce must still submit evidence tending to show that CRL's negligence contributed to his accident, he can survive summary judgment by submitting "evidence scarcely more substantial than pigeon bone broth." *Harbin v. Burlington N. R.R. Co.*, 921 F.2d 129, 132 (7th Cir. 1990).

CRL contends that Pierce has failed to submit any evidence to support his allegations that CRL was negligent or that its negligence caused the accident. Considering its memorandum in support and reply brief together, it is apparent that CRL premises its argument on its ability to exclude Pierce's experts' opinions and any allegations concerning Johnson's acts. Its entire reply is dedicated to arguing why the Court should refuse to consider certain evidence when evaluating the motion; it does not even attempt to argue that Pierce is unable to show a genuine issue of material fact if such evidence is permitted.

In light of the fact that the Court has chosen to admit much of the contested evidence, there is ample evidence tending to show that CRL's negligence played a part in causing Pierce's injury. Specifically, Pierce has provided some evidence from which a jury could find that some or all of the following factors contributed to his accident: Johnson's negligent operation of the train, CRL's rules permitting conductors to mount and dismount moving trains, Pierce's inadequate training, and substandard track conditions. Pierce has unquestionably raised a genuine issue of fact regarding whether CRL's negligence caused his accident, thus the Court denies CRL's motion for summary judgment.

**2.      CSXT, CSXI, and CSXIT's Motion for Summary Judgment**

      **a.      Negligence Claim**

18

Because only employers can be held liable under the FELA, Pierce makes only common law negligence claims against CSXT, CSXI, and CSXIT (the "CSX defendants"). As these companies are three distinct legal entities, Pierce must present evidence sufficient for a finding that the negligence of each caused his injuries. Before addressing the merits of the defendants' motion for summary judgment, the Court must deal with several preliminary issues raised by the defendants in their reply brief.

### 1. Preliminary Issues

First, the CSX defendants contend that Pierce has abandoned his claim that these defendants failed to provide a safe place to work, violated the Federal Safety Appliance Act, 49 U.S.C. § 20302, and violated the Federal Locomotive Inspection Act, 49 U.S.C. § 20701. The Court notes that none of these allegations forms a separate claim; instead, Pierce alleges in his complaint that each of these acts or omissions supports his claim that the CSX defendants breached their duty to provide Pierce with a safe place to work.

Pierce certainly has not abandoned the contention that the CSX defendants failed to provide a safe place to work. That is the very premise of his entire negligence claim against these defendants. It is encompassed within his accusations that defendants failed to promulgate necessary safety rules, failed to enforce safety rules, and violated federal regulations concerning track conditions. This claim is implicit throughout the brief and was not abandoned.

Pierce has, however, abandoned the two alleged statutory violations as a grounds for negligence against the CSX defendants. In his response to summary judgment, Pierce makes no effort to explain how these defendants violated the Federal Safety Appliance Act or the Federal Locomotive Inspection Act. Nor did he explain how either of these statutes imposed a duty on

19

the defendants. Because a party opposing summary judgment must affirmatively demonstrate there is a genuine issue of material fact for trial and may not merely rest on the pleadings, *see Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003), the Court finds that Pierce has abandoned these arguments.

The CSX defendants' remaining preliminary arguments duplicate those of CRL that the Court has already rejected.

### b. Negligence Claim Against CSXT

To sustain a claim for negligence under Illinois law, a plaintiff must show that the defendant owed him a duty, that the defendant breached that duty, and that this breach was the proximate cause of the plaintiff's injuries. *Bermudez v. Martinez Trucking*, 343 Ill. App. 3d 25, 29, 796 N.E.2d 1074, 1078 (2003). The initial inquiry is whether CSXT owed Pierce a duty, because there can be no negligence unless there is a duty. *LaFever v. Kemlite Corp.*, 185 Ill. 2d 380, 389, 706 N.E.2d 441, 446 (1998). The existence of a duty is an issue of law. *Id.*

CSXT contends that it did not owe Pierce a duty because it neither possessed nor controlled Bedford Rail yard at the time of the accident. CSXT relies on Illinois law regarding premises liability. Under premises liability law, a defendant owes no duty to a plaintiff unless the defendant actually possesses or controls the real property on which the alleged tort occurred. *See Godee v. Illinois Youth Soccer Ass'n*, 327 Ill. App. 3d 695, 699, 764 N.E.2d 591, 595 (2002). Pierce, however, does not base his claim on a theory of premises liability. Rather, he maintains that CSXT had a statutory duty to ensure that the condition of the tracks at Bedford Park yard was in compliance with the Federal Track Safety Standards ("FTSS") adopted by the FRA. 49 C.F.R. § 213.

20

Under Illinois law, a violation of a safety standard is relevant, though not conclusive, in determining whether a duty exists. *See O'Conner v. Commonwealth Edison Co.*, 748 F. Supp. 672, 676 (C.D. Ill. 1990), *aff'd*, 13 F.3d 1090 (7th Cir. 1994). In evaluating whether a federal regulation can establish a standard of care, the Court must consider factors such as the relationship of the parties, the likelihood of injury, whether there is a reasonable foreseeability of injury, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the defendant. *Godee*, 327 Ill. App. at 698; *see also O'Conner*, 748 F. Supp. at 677. Likewise, when a regulation is relevant to the applicable standard of care, Illinois courts have relied on the Restatement (Second) of Torts § 286 to determine the appropriate duty. *Id.*; *see also O'Conner*, 13 F.3d at 1103 n.11. Section 286 provides that:

> The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part (a) to protect a class of persons which includes the one whose interest is invaded, and (b) to protect the particular interest which is invaded, and (c) to protect that interest against the kind of harm which has resulted, and (d) to protect that interest against the particular hazard from which the harm results.

RESTATEMENT (SECOND) OF TORTS § 286 (1965).

Each of these elements is satisfied in the present case. The FTSS prescribes the minimum safety requirements for railroad track that is part of the general railroad system of transportation.[4] 49 C.F.R. § 213.1. The owner of the track is responsible for ensuring that the track complies

---

[4] The parties dispute whether the track on which the accident occurred is within the "general railroad system of transportation." The FRA defines this term as "the network of standard gage track over which goods may be transported throughout the nation and passengers may travel between cities and within metropolitan and suburban areas." Statement of Agency Policy Concerning Enforcement of the Federal Railroad Safety Laws, 49 C.F.R. pt. 209, App. A. The defendants have not presented evidence sufficient to show that the Bedford Park yard is excluded from the regulations. Pierce points out that the yard ships and receives freight cars involving all the major railroads and that the yard has access from both the east and west over the Belt Railway Company of Chicago. He also argues that CRL's operation over the track brings the yard within the regulations. Pierce has at least raised a genuine issue of fact as to whether the rail yard is part of the general system or whether the regulations nevertheless apply.

with the requirements. *Id.* § 213.5. As the title of the regulations suggests, the purpose of the regulations is to ensure safety. The regulations specifically address vegetation growth, *id.* § 213.37, and drainage systems, *id.* § 213.33. Section 213.37 specifically contemplates that one of the reasons vegetation must be controlled is so that it does not interfere with railroad employees performing normal trackside duties. *Id.* § 213.37. Thus, certain aspects of the regulations were created at least in part to protect railroad employees like Pierce who perform trackside duties. Though the regulations do not explicitly state that they are designed to prevent a worker from getting injured while trying to mount a train, this type of activity surely falls under the category of "trackside duties" that the statute is aimed at protecting.

Though CSXT had leased the property to CSXI and though it was not Pierce's employer, the FTSS regulations place the burden of compliance on the owner of the track, not altogether unlike the relationship of a landowner to a business invitee. Even if the owner leases or otherwise assigns responsibility for the track to another person or entity, the owner is still responsible for compliance and subject to penalties. *See* 49 C.F.R. § 213.5(d). Based on the fact that the FRA adopted a standard set of regulations for track conditions, by implication, there is a significant likelihood of injury associated with poor track conditions and a reasonable foreseeability of accidents. Similarly, the regulations already place the burden on CSXT of guarding against injury by keeping the track in a safe condition, thus the magnitude of the burden and the consequences of placing the burden on the defendant do not come into play. Thus, the Court holds that CSXT owed Pierce a duty to comply with the federal safety standards governing track conditions.

The Court also finds that Pierce has offered evidence from which a jury could find that

22

CSXT failed to comply with the FTSS regulations, thus breaching its duty. CRL points out that an FRA qualified track inspector inspected the track after the accident occurred and several days later and found no conditions that violated federal regulations. *See* CRL's 56.1 Stmt. ¶ 60-61. As discussed earlier, however, plaintiff's expert Blackwell has concluded that the track did not comply with federal regulations, citing vegetation, improper drainage, and a depression in the ballast. Viewing the facts in the light most favorable to Pierce, as we must at this juncture, the Court cannot conclude that the track complied with FTSS standards.

Pierce has likewise submitted evidence sufficient for a jury to find that CSXT's negligence in maintaining the track caused Pierce's injury. Proximate cause is typically a question of fact. *See Bermudez v. Martinez Trucking*, 343 Ill. App. 3d 25, 30, 796 N.E.2d 1074, 1078 (2003). Because Pierce has no recollection of the accident and there were no eyewitnesses, CSXT argues that Pierce's claim of causation is speculative. CSXT is correct that liability in a negligence action cannot be predicated upon "mere surmise, guess, or conjecture as to the cause of the injury." *Id.* at 30, 796 N.E.2d at 1078. Rather, the plaintiff is required to establish that there is a "reasonable certainty" that the defendant's actions caused the injury. *Id.* Pierce may establish this connection by circumstantial evidence, that is, facts or circumstances from which a jury may infer other connected facts that usually and reasonably follow, based on common experience. *Nowak v. Coghill*, 296 Ill. App. 3d 886, 896, 695 N.E.2d 532, 539 (1998). "Even where the circumstances support more than one logical conclusion, circumstantial evidence is sufficient to establish proximate cause to overcome a motion for summary judgment as long as the inferences in question may reasonably be drawn from the evidence." *Id.*

Pierce has provided the court with expert testimony linking the negligently maintained

track to his injury. Blackwell opines that the poor track conditions he observed days after the accident, including an inadequate drainage system and a ballast section fouled with vegetation, caused the locomotive to sway laterally, impeding Pierce's ability to safely mount the moving train. A jury reasonably could infer that the track conditions as described by Blackwell proximately caused Pierce's injury.

### c. Negligence Claim Against CSXI

Pierce raises three points to support his contention that CSXI's negligence caused his accident. First, Pierce argues that under its lease with CSXT, CSXI agreed to maintain the track, and in particular, the drainage system, thus CSXI's negligence in failing to properly maintain the track caused his accident.[5] Second, Pierce argues that CSXI should have excluded Johnson from the yard because it had the right under its service agreement with CRL to exclude CRL employees who failed to comply with any rule or regulation or otherwise engaged in negligent or wrongful acts. *See* Service Agreement, Defs' Ex. R. Third, Pierce maintains that CSXI was negligent in failing to enact a rule forbidding any person from mounting moving equipment in Bedford Park yard.

CSXI acknowledges that as the land possessor of Bedford Park yard, Illinois law imposes on it a duty of ordinary care towards Pierce, a business invitee on the premises. It argues, however, that CSXI did not breach its duty and that Pierce has failed to show that any alleged breach proximately caused his injury. CSXI also maintains that it did not owe Pierce a duty to ensure that Pierce's employer, CRL, and its employees were performing work on the premises in

---

[5] Pierce does not contend that CSXI violated the FTSS. He simply asserts that it negligently maintained the track and that this caused his injury.

24

a safe manner.

Illinois follows the Restatement (Second) of Torts § 343 to determine the liability of possessors of land to invitees. *Genaust v. Illinois Power Co.*, 62 Ill. 2d 456, 468, 343 N.E.2d 465, 472 (1976). Section 343 provides:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

RESTATEMENT (SECOND) OF TORTS § 343 (1965). As mentioned earlier, whether breach of a duty occurred is generally a question for the trier of fact.

Pierce has submitted evidence sufficient for a jury to conclude that CSXI negligently failed to maintain the track in a safe condition and is thus liable for Pierce's injuries. CSXI had a duty of ordinary care to rid the property of unreasonably dangerous conditions. A jury reasonably could determine that CSXI should have been aware of the unreasonable risk of harm to workers that is associated with substandard track conditions. One may fairly infer that the vegetation lining the ballast did not appear overnight, nor is inadequate drainage likely to go unnoticed. A jury might also determine that CSXI reasonably should have been aware of the defects in the ballast near the 12/13 switch. Similarly, a jury could conclude that CSXI should have expected that workers mounting trains in the yard might be unaware of hazards, such as a faulty ballast, that would make it more difficult to step up onto the train. And finally, as discussed earlier, a jury could reasonably conclude that the negligently maintained track was a

25

proximate cause of Pierce's accident.

CSXI likewise had a statutory duty to ensure that the condition of the tracks at Bedford Park yard was in compliance with the FTSS. Under the FTSS, if an owner of track leases responsibility for the track to another entity, the assignee also becomes responsible for compliance and is subject to penalties under § 213.15. *See* 49 C.F.R. § 213.5(c) & (d). Under its lease with CSXT, CSXI assumed responsibility for maintaining the track and premises, "including removal of snow, ice weeds, brush, debris and/or spillage from Lessee's operations." Track Lease Supplement at ¶ 4.1, CSX Defs' Ex. Q. CSXI also contracted to maintain the drainage ditches within the yard. *Id.* at ¶ 7.1.

Pierce's second contention is that CSXI should have excluded Johnson from the yard due to rumors that he frequently engineered the train too fast. The service agreement, however, does not create a duty running from CSXI to Pierce. Instead, it merely gives CSXI the right to exclude CRL employees who do not act in accordance with regulations. As a general rule, "an employer of an independent contractor is not liable for the acts or omissions of the latter." *Fris v. Personal Products Co.*, 255 Ill. App. 3d 916, 923, 627 N.E.2d 1265, 1269 (1994). Under the Restatement (Second) of Torts § 414, one who entrusts work to an independent contractor is subject to liability for physical harm to others only where the employer retains at least some degree of control over the manner in which the work is done.[6] RESTATEMENT (SECOND) OF TORTS § 414

---

[6] Comment c to Section 414 provides:

In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There

(1965); *Hutchcraft v. Independent Mechanical Industries*, 312 Ill. App. 3d 351, 358, 726 N.E.2d 1171, 1177 (2000). The ability to enforce safety regulations at the yard, however, does not constitute control. *See Hutchcraft*, 312 Ill. App. 3d at 359, 726 N.E.2d at 1177 (holding that the ability to inspect work and enforce safety regulations does not constitute control); *Fris*, 255 Ill. App. 3d at 923-24, 627 N.E.2d at 1269 (finding no duty where company retained the right to make sure work was done in a safe manner but did not control the routine and incidental aspects of the independent contractor's work). Thus, no duty arose and CSXI may not be held liable for failing to exclude Johnson from the yard.

The same logic applies to Pierce's contention that CSXI was negligent for failing to proscribe the practice of getting on and off moving trains in the yard. According to Pierce, CSXI had the power to enact a rule prohibiting the practice, as the service agreement provided that CRL must obey CSXI safety rules. He also contends that CSXI should have been aware of the danger of this practice because it is prohibited in most yards, including CSXI's own 59th Street yard. But that rule was created by CSXT, the company that supplied the switching crews at the 59th Street yard. And the service agreement provides only that CSXI had the right to make sure work is done safely. This type of general authority is insufficient to constitute control under § 414. *See Hutchcraft*, 312 Ill. App. 3d at 359, 726 N.E.2d at 1178.

In sum, Pierce has raised a triable issue as to whether CSXI was negligent in failing to

---

must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

Restatement (Second) of Torts § 414, comment c (1965).

properly maintain track conditions, but **CSXI did not** owe Pierce a duty to exclude CRL employees or override CRL operating rules in the yard. CSXI's motion for summary judgment is denied.

### d. Negligence Claim Against CSXIT

Pierce appears to simply lump **CSXIT together** with CSXI. He argues that CSXIT was negligent in allowing Johnson to operate trains at Bedford Park yard, for failing to enact a safety rule prohibiting getting on moving equipment, and for violations of the track safety standards. For the reasons discussed with regard to **CSXI, CSXIT** did not owe Pierce a duty to exclude Johnson or to enact a safety rule prohibiting getting on moving equipment.

Pierce has cited no authority that the **FTSS** imposes a duty on a company that manages property. Nor has Pierce presented any evidence that CSXIT had control over the track condition or otherwise qualifies as a possessor of the premises who might be held liable under a general negligence theory. Pierce asks the Court to keep in mind the close corporate relationship between the CSX defendants, however, because he is not seeking to pierce the corporate veil, he must independently establish a negligence cause of action against each defendant. The Court finds that Pierce has not offered facts sufficient for a finding of negligence against CSXIT, thus its motion for summary judgment is granted.

### e. Loss of Consortium Claim

A loss of consortium claim is derivative in nature, thus its viability depends on the success of the injured spouse's claims. *See McCreary v. Libbey-Owens-Ford Co.*, 132 F.3d 1159, 1167 (7th Cir. 1997). Because the negligence claims against CSXT and CSXI survive

summary judgment, the Court denies these **defendants'** request to bar Heidi Pierce's loss of consortium claim. The loss of consortium **claim against** CSXTI is dismissed, as Pierce has failed to allege facts sufficient to establish that **this defendant's** negligence caused his accident.

For the reasons stated above, the **Court denies CRL**, CSXT, and CSXI's motions for summary judgment and grants CSXIT's **motion. The** case is set for a status hearing on March 24th, 2005 at 9:30 a.m. for the purpose of **setting a trial** date. Trial counsel are directed to appear.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 15, 2005